1             **IN THE UNITED STATES DISTRICT COURT**
          **FOR THE SOUTHERN DISTRICT OF ILLINOIS**

2

3 DALLAS McINTOSH,             )
                        )

4             Plaintiff,    )
                        )

5     vs.              ) No. 17-cv-103-JPG-DGW
                        )

6 WEXFORD HEALTH SOURCES, INC., )
et al.,               )

7                     ) August 15, 2018
          Defendants.   )

8

9           **TRANSCRIPT OF EVIDENTIARY HEARING**
      **BEFORE THE HONORABLE DONALD G. WILKERSON**

10           **UNITED STATES MAGISTRATE JUDGE**

11                 **APPEARANCES**

12 **FOR PLAINTIFF:**        Dallas McIntosh, B85114
                     Pinckneyville Corr. Center

13                      5835 State Route 154
                     Pinckneyville, IL  62274

14

15 **FOR DEFENDANTS:**      Rodney M. Sharp, Esq.
                     Kevin K. Peek, Esq.

16                      Sandberg, Phoenix, et al.
                     600 Washington Ave., 15th Fl.

17                      St. Louis, MO  63101-1313
                     (314) 231-3332

18                      Maxwell D. Huber, Esq.
                     Cassiday Schade LLP

19                      100 N. Broadway, Suite 1580
                     St. Louis, MO  63102

20                      (314) 241-1377

21 **REPORTED BY:**         Laura A. Esposito, RPR, CRR, CRC
                     Official Court Reporter

22                      U.S. District Court
                     750 Missouri Avenue

23                      East St. Louis, IL  62201
                     (618) 482-9481

24                      Laura_Esposito@ilsd.uscourts.gov

25     Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

 1          *(Proceedings convened in open court at 4:08 p.m.)*

 2                    **COURTROOM DEPUTY:**  *Dallas McIntosh vs. Wexford*

 3     *Health Sources, et al.*, Case No. 17-103, is called for a

 4     *Pavey* hearing.

 5               Will the parties please identify themselves for the

 6     record.

 7               **THE COURT:**  Mr. McIntosh, can you see me?  Can you

 8     hear me?

 9               **MR. McINTOSH:**  Yes, sir, I can.

10               **THE COURT:**  All right, very good.  Who do we have

11     for Wexford Health Sources today?

12               **MR. SHARP:**  Rodney Sharp and Kevin Peek on behalf

13     of Wexford Health Sources and Barbara Rodriguez, Your Honor.

14               **THE COURT:**  All right, very good.  Mr. Sharp, do we

15     have -- oh, okay.  You're over there.

16               We've got Mr. Huber here for Defendant Nancy Keen,

17     correct?

18               **MR. HUBER:**  Yes, Your Honor.

19               **THE COURT:**  We'll do this seated.  We'll do it

20     sitting down today.

21               For the record, today is August 15th.  It's about

22     4:12 by the courtroom clock.  For the record, we previously

23     started this hearing, I believe it was on July 16th.  Is

24     that the date?  But, anyway, we previously started this

25     hearing, Mr. McIntosh, and I don't know about on your end

1    but on my end the screen just went brown, went black, and we

2    lost you.  I'm told that it was because of a power -- they

3    didn't call it a black-out, they called it a brown-out, so

4    we lost you when we had started that hearing July 16th.

5              **COURTROOM DEPUTY:**  Seventeenth.

6              **THE COURT:**  All right, July 17th.  And what had

7    happened -- and I believe where we were -- when we had that

8    hearing I had gone through the facts of your case and I went

9    through them in great detail, and we were just about to get

10   to what I needed to hear in order to make a ruling on the

11   motions that are in front of me.  And the motion that's in

12   front of me, of course, is a motion, what we commonly call a

13   *Pavey* motion where defendants allege that you didn't exhaust

14   your remedies at the jail before you filed suit.

15             So that's where we were last time.  I'm not going

16   to go back through all of those facts again.  There was a

17   court reporter, and if need be, we can get a transcript of

18   that hearing.  The Court is aware of the facts.  The facts

19   were taken down by the court reporter, and if we ever need

20   to, we can get a transcript of that hearing from July the

21   17th.

22             And I think what had happened -- Mr. Sharp, I

23   believe that you were up, and I was just getting ready to go

24   into -- it's your motion, so I had some questions for you,

25   and I want to resume from that spot.

1          Why don't we do this.  Why don't we just swing the

2     camera over to you, and he can hear me and he can see you as

3     we go through this.

4          Now, the first thing I want to talk about -- hold

5     on a second.  I need to ask my clerk something.

6          *(Off the record discussion between the Court and law*

7          *clerk)*

8          **THE COURT:**  All right.  The facts of this case, of

9     course, implicate actions that happened at the St. Clair

10    County Jail.  So I want to go through something, and --

11    Mr. Sharp, and then you tell me if I've got it right.

12          So what's at issue here is the grievance procedure

13    at the jail, correct?

14          **MR. SHARP:**  Correct.

15          **THE COURT:**  Okay.  Pull the mic, for the plaintiff,

16    over.

17          **MR. SHARP:**  Correct.

18          **THE COURT:**  All right.  Let me tell you what I

19    understand the grievance procedure at St. Clair County Jail

20    to be.  All right.  This is fairly new, I'll say, because at

21    one time, recalling Sheriff Justus came and told me the

22    grievance procedure was, if they had a problem, tell him.

23    So there is a procedure in place now at the county jail.

24          All right.  And this is the procedure that I'm told

25    is in place, and you tell me if this is the procedure that

1    was in place when Mr. McIntosh was there.  This procedure

2    was called a detainee rules and regulations, and it was set

3    forth in a manual that set forth the grievance procedure,

4    and that grievance procedure was that an inmate had to

5    submit what's called a captain's request, okay?  And the

6    captain's request is a written document that is submitted to

7    the shift supervisor who, in turn, gives the request to the

8    captain.

9         Okay?  So far, so good?  Anything you disagree with

10   there?

11        MR. SHARP:  No, Your Honor.

12        THE COURT:  Okay.  It appears to me, from what I

13   can tell, that if anything happens with the captain's

14   request, then the manual requires an inmate to submit a

15   formal grievance, again to the shift supervisor, within

16   writing within 24 hours after he learned of the

17   circumstances or conditions which prompted the grievance.

18        So far, so good?

19        MR. SHARP:  That is correct.

20        THE COURT:  Okay, all right.  The shift supervisor

21   passes the grievance on to the immediate supervisor, and

22   what I can't tell is if this immediate supervisor is the

23   immediate supervisor of the shift supervisor or the

24   immediate supervisor of the person that the grievance is

25   regarding.  I need a little help with that, who the

```
 1    immediate supervisor is.  And the supervisor has three days
 2    to file a response, which the detainee can then appeal to
 3    the assistant jail superintendent, who -- and, again, I'm
 4    going in another case that I had here, that that assistant
 5    jail superintendent was also the captain who got the
 6    original captain's request, so -- and then on to the jail
 7    superintendent who issues the final decision.
 8              Am I right about the procedure?
 9         MR. SHARP:  I believe you are.  That's three days,
10    not including weekends and holidays, Your Honor.
11         THE COURT:  Okay.  All right.  So what we have here
12    and what I think is at issue is -- on Mr. McIntosh's part
13    is, was that procedure available to him?  That's what he's
14    alleging.  What he's alleging is that he was informed by
15    Sergeant Strubberg -- he told Sergeant Strubberg he wanted
16    to file a grievance, correct, Mr. McIntosh?
17         MR. McINTOSH:  That is correct, Your Honor.
18         THE COURT:  All right.  And he complained in his
19    complaint -- it's a verified complaint -- that Strubberg
20    informed him that he was under criminal investigation
21    concerning the pills that were discovered in his property
22    and that he would have to complete the investigation before
23    he could file a grievance.
24              He filed his complaint with a copy of the sheriff's
25    department incident report that corroborates the jail was
```

1    investigating the possibility of criminal charges.  So there

2    was an investigation.  He submitted the report.  So that's

3    what -- that's where I am.  If -- he was told even though

4    the process was in place, his position is, he was told he

5    couldn't start the process until the criminal charges --

6    'til an investigation regarding the criminal charges was

7    complete.

8           **MR. SHARP:**  That's --

9           **THE COURT:**  I'm asking.  I mean that's what he's --

10   that's his position, correct?

11          **MR. SHARP:**  That's not quite how I understand his

12   position, Your Honor.

13          **THE COURT:**  You tell me how you understand his

14   position.  He's here and he can clear it up.

15          **MR. SHARP:**  Attached to Mr. McIntosh's response

16   were two documents, Exhibit A and an Exhibit B.  My

17   understanding is, Exhibit A is a captain's complaint form

18   that he, that Mr. McIntosh claims to have submitted on

19   August 4th, 2013, the day that he was moved from max, from

20   the infirmary to max, after the discovery of contraband in

21   his bunk in the infirmary.

22          Exhibit B is the complaint form that he completed

23   on August 5, 2013, the following day.  And so he started the

24   process, and his claim is that it was after that point in

25   time when Sergeant Strubberg handed these back to him a few

1    days later and told him that he does not need to do anything

2    further, that he's claiming that Sergeant Strubberg told him

3    that he didn't have to do anything.

4         **THE COURT:**  Well, I'm a little -- okay.  Let's

5    figure that out.

6         Now, Mr. McIntosh -- okay.

7         **MR. McINTOSH:**  Yes, Your Honor.

8         **THE COURT:**  Is Mr. -- Mr. Sharp is correct when he

9    tells me you started the process on August 4th and 5th,

10   correct?

11        **MR. McINTOSH:**  Yes, sir.

12        **THE COURT:**  Okay.  Now, at some point

13   Sergeant Strubberg gave you these documents back, is that

14   what you're telling me?

15        **MR. McINTOSH:**  Yes, sir, he gave them to me.  On or

16   about August 6th, I was called to the chapel.  When I got

17   there I asked them about my grievances -- my chaplain's

18   request.  I'm sorry.  I often use the terms interchangeably.

19   I asked him about my captain's request.  He told me that he

20   was in receipt of them, that he wanted to speak with me

21   about other matters first.  That was when he tried to

22   interview me on tape about the possible criminal charges.

23   He read me my *Miranda* rights so I exercised them.  As we

24   were ending the interview he began to speak to me saying we

25   were off the record, and in a conversation that then

1  happened was when he told me that -- all right.  When I

2  first submitted the first captain's request on August 4th, I

3  submitted it to officer named C/O Dante Beattie.  He was of

4  the same work shift that discovered the pills.  And upon

5  submitting that to him, because I already had that in my

6  possession --

7          **THE COURT:**  Slow down.  You're going too fast.

8  You're killing the court reporter.  You're going too fast.

9  Slow down.

10          **MR. McINTOSH:**  I'm sorry.

11          All right.  When I first submitted my first

12  captain's request on August the 4th, I submitted it to the

13  C/O named Dante Beattie.  He was of the same work shift that

14  had discovered the pills earlier that morning.  When I

15  submitted it to him, I asked him for a formal detainee

16  grievance form and I also asked him for a sick call slip.

17  It was at that point that he informed me that he could not

18  give me a detainee grievance form because, as you say,

19  Your Honor, something must be done about the captain's

20  request first before I could receive a detainee grievance

21  form.

22          **THE COURT:**  Okay.  But at some point -- hold on.

23  At some point you filled out the captain's request, then you

24  filled out a complaint form, right?

25          **MR. McINTOSH:**  I filled out a captain's request on

1    August 4th.

2            THE COURT:  Right.

3            MR. McINTOSH:  And I filled out another captain's

4    request on August 5th.  I never got a response to those.

5            THE COURT:  All right.  Hold on.  I just need the

6    information I need, okay?

7            MR. McINTOSH:  Okay.

8            THE COURT:  So you filled out two; one on

9    August 4th, one on August 5th?

10           MR. McINTOSH:  Yes, sir.

11           THE COURT:  You talked to Sergeant Strubberg.  Am I

12   saying it right, "Strewberg", "Strubberg"?

13           MR. McINTOSH:  It's "Strewberg," yes, sir.

14           THE COURT:  "Strewberg," okay.  And he tried to

15   interview you, you exercised your rights, and then we were

16   at the end of the interview he wanted to talk to you off the

17   record, and he told you what?

18           MR. McINTOSH:  He told me that the first step

19   that -- because I was under criminal investigation, the

20   first step in grievance process would be for the

21   investigation to be completed before I would receive an

22   answer to my captain's request and then be allowed to retain

23   a detainee grievance form.

24           THE COURT:  Okay.  Stop, stop.  Time out.  I just

25   want to make sure.  I just need to know what I need to know,

1  okay?

2         **MR. McINTOSH:**  Yes, sir.

3         **THE COURT:**  So what you told me was, you talked to

4  Strubberg, he told you that you couldn't get -- you couldn't

5  go any further in the process until the criminal

6  investigation was complete, correct?

7         **MR. McINTOSH:**  That is correct, Your Honor.

8         **THE COURT:**  All right.  Okay.  All right.  When

9  was -- and this is for you, Mr. Sharp, or Mr. McIntosh.

10  When was the investigation completed?

11         **MR. SHARP:**  Well --

12         **MR. McINTOSH:**  It was never completed.

13         **THE COURT:**  All right.  Hold on.  I got that.  Your

14  position is it was never completed.  What's the defendants'

15  position?  Was it ever completed?

16         **MR. SHARP:**  The source of the contraband was

17  identified about 14 months after it was discovered in

18  Mr. McIntosh's bunk.

19         **THE COURT:**  So would it -- is it fair to say that

20  that investigation was over for 14 months, is that right?

21         **MR. SHARP:**  That's exactly right, Your Honor.

22         **THE COURT:**  Okay.  All right.  Now, when did -- and

23  I'm just asking.  I just need these facts.  I'm going to

24  hear your argument.  I'm not precluding any argument from

25  you or anything that you want to tell me.  I just want to

1   make sure I understand what Mr. McIntosh's position is.

2         Okay.  So the 14 months, the criminal investigation

3   was open.  When was Mr. McIntosh transferred from the jail

4   to IDOC?

5         **MR. SHARP:**  I don't know the answer to that,

6   Your Honor, off the top of my head.

7         **THE COURT:**  You can help me with that, Mr. Huber?

8         **MR. HUBER:**  January 30th, 2015.

9         **THE COURT:**  January 30th of what year?

10        **MR. HUBER:**  2015.

11        **THE COURT:**  2015.  So when he was transferred, you

12  said January the --

13        **MR. HUBER:**  Thirtieth.

14        **THE COURT:**  Thirtieth, okay.  So when he was

15  transferred, the criminal investigation was still open,

16  correct?  Didn't this happen in '14?

17        **MR. SHARP:**  It happened in --

18        **MR. HUBER:**  '13.

19        **MR. SHARP:**  -- '13.

20        **THE COURT:**  '13, okay.  Well, let's see.  Okay.  So

21  August of '13.  So 14 months would have been around October

22  of '14.

23        So, now, Mr. McIntosh, were you ever notified that

24  the criminal investigation was over?

25        **MR. McINTOSH:**  Absolutely not, sir.  And the thing

```
 1    is that the defendants here are making an assumption that
 2    the investigation was over.  Strubberg never said that.  In
 3    fact, I --
 4              THE COURT:  Time out.  Just listen to me.  Just
 5    answer my questions.  You're telling me more information
 6    than I need, okay?
 7              Were you ever informed -- is the simple question --
 8    were you ever informed that the criminal investigation was
 9    over?
10              MR. McINTOSH:  No, sir.
11              THE COURT:  By anybody at the jail before you
12    were --
13              MR. McINTOSH:  No, sir, absolutely not.
14              THE COURT:  Okay.  That's my question.  Okay.
15    Now -- all right.
16              Now, Mr. Sharp, how do you respond to his position
17    that -- and the legal theory that he's asserting is that the
18    grievance process was not available to him because he was
19    told he couldn't go further in it until the criminal
20    investigation was over.  What he's told me is, to this day
21    he didn't know that the criminal investigation was ever
22    over.
23              MR. SHARP:  Sergeant Strubberg will testify
24    otherwise, Your Honor.
25              THE COURT:  Well, hold on.  Talk into the mic.  I
```

```
1    want to hear.  Tell me what -- is Sergeant Strubberg here?
2         MR. SHARP:  He is here.
3         THE COURT:  Okay.  Tell had me a proffer of
4    Sergeant Strubberg's testimony.
5         MR. SHARP:  Sergeant Strubberg will testify that he
6    never told Mr. McIntosh not to file a grievance, not to file
7    a captain's request, or anything along those lines.
8         More importantly, Judge, what I'd like for you to
9    consider is that Exhibits A and B are the complaints that
10   Mr. McIntosh claims to have filed on October 4th and 5th.
11        THE COURT:  August.
12        MR. SHARP:  Excuse me.  Thank you.  August 4th and
13   5th of 2013.  Sergeant Strubberg will tell you that they
14   conducted an extensive investigation to find out how it was
15   that Mr. McIntosh received both prescription and
16   nonprescription medications, lighters, rolling papers, and
17   cigarettes, and that it took them 14 months to identify the
18   source of that contraband as being somebody within the
19   healthcare unit.  And he will tell you that if he had
20   Exhibits A or B at any point in time, which clearly identify
21   the source of the contraband as a nurse, it wouldn't have
22   taken them 14 months to conduct their investigation.
23        THE COURT:  So hold on.  I want to -- hold on.  I'm
24   just -- you're telling me more than I want to know, too, so
25   listen.  So are you -- is it your position then that these
```

```
 1    documents, A and B, were not filed at the jail?

 2            MR. SHARP:  Absolutely.

 3            THE COURT:  So they were not filed at the jail?

 4            MR. SHARP:  That is correct.

 5            THE COURT:  Okay.  All right.

 6            MR. SHARP:  It's our -- there's no indication on

 7    either of the documents, like with other grievances, that

 8    they were reviewed by anybody or received by anybody at the

 9    jail, and --

10            THE COURT:  Well, his testimony is Strubberg gave

11    them back to him.

12            MR. SHARP:  So that means Sergeant Strubberg had

13    them in his possession at some point in time.

14            THE COURT:  Correct.

15            MR. SHARP:  Sergeant Strubberg will tell you he

16    would have read them, and if he read them that said that

17    they --

18            THE COURT:  You're telling me more.  You're telling

19    me Strubberg says he never saw them, period?

20            MR. SHARP:  Correct.

21            THE COURT:  Okay.  That's what I want to know.  All

22    right.  Also, I want to know, will Sergeant -- is it

23    Sergeant Strubberg?

24            MR. SHARP:  Yes.

25            THE COURT:  Will Sergeant Strubberg testify that he
```

```
 1   did not have an off-the-record conversation with

 2   Mr. McIntosh?

 3        MR. SHARP:  I don't know the answer to that.  I

 4   think he'll testify that the conversation with Mr. McIntosh

 5   is different than how Mr. McIntosh just relayed it.

 6   Mr. McIntosh would not give him any information at that

 7   point in time, and he never got to the point of Mirandizing

 8   him.

 9        THE COURT:  Come on up, Sergeant Strubberg.  Come

10   on up.  This is how we're going to do this, Mr. McIntosh.

11   Raise your right hand.

12        STEVE STRUBBERG, DEFENDANT'S WITNESS, SWORN

13                   DIRECT EXAMINATION

14                QUESTIONS BY THE COURT:

15        THE COURT:  Very good.  I'm going to -- I've sworn

16   Sergeant Strubberg in.  I'm going ask him some questions.

17   If you have questions for him, you can ask me.  If they're

18   relevant, I'll ask him.  Okay?  But if you listen, I may ask

19   the questions that you would have asked.

20   Q.   (The Court) All right.  Very good.  You heard my

21   question.  You heard Mr. McIntosh testify.  He also testified

22   that you brought him in to interview him about the appeals, is

23   that correct?

24   A.   That is correct.

25   Q.   Okay.  He also testified that you read him his Miranda
```

```
1    rights, is that correct?

2    A.    I don't recall if we made it to Miranda.  I do recall

3    he --

4    Q.    Pull the microphone up.  I don't know if he can hear

5    you.

6    A.    Your Honor, I don't recall if we made it to Miranda.

7    I do remember --

8              THE COURT:  Can you hear him, Mr. McIntosh?

9              MR. McINTOSH:  Yes, Your Honor.

10             THE COURT:  All right.  Very good.  Go ahead.

11             THE WITNESS:  I don't recall if we made it to

12   Miranda.  I do recall him telling me he did not want to

13   discuss the incident with me.

14   Q.    (The Court) Okay.  Now, you also heard him tell me that

15   you -- at the end of the conversation, after he invoked his

16   rights, you asked to have a conversation with him off the

17   record.  Did you ask to have a conversation with him off the

18   record?

19   A.    No, Your Honor, I did not.

20             THE COURT:  Okay.  Is there anything else you want

21   me to ask Sergeant Strubberg, Mr. McIntosh?

22             MR. McINTOSH:  Yes, sir.  Several things.  First,

23   it is true that I was under criminal investigation, correct?

24             THE COURT:  Hold on.  Hold on.  Tell me what the

25   question is.  I'll ask the question.  And I think that
```

1   that -- but, anyway, he can answer it.  But I mean he said

2   he brought you in to ask you about that.

3   Q.    (The Court) It's true he was under criminal

4   investigation?

5   A.    I wouldn't categorize Mr. McIntosh as being under

6   criminal investigation.  We were investigating the source of

7   the contraband.  It was clearly in his possession.

8   Q.    Okay.  So, but it was illegal contraband, correct?

9   A.    Correct.

10  Q.    And it could possibly have been a criminal offense,

11  correct?

12  A.    It could have been, yes.

13         THE COURT:  Okay.  So what they're saying,

14  Mr. McIntosh, is that evidently they had not determined at

15  that point if you were under criminal investigation, but you

16  could have been.

17         All right.  What's your other question?

18         MR. McINTOSH:  Let me rephrase it then.  The report

19  that was issued about the discovery of appeals, it did say

20  at the bottom of the report that all of the evidence had

21  been forwarded for criminal investigation, is that correct?

22         THE COURT:  Wait.  What report are we talking

23  about?  Give me a date on the report.

24         MR. McINTOSH:  That was the jail incident report,

25  Your Honor, that was attached to my verified complaint.

1          **THE COURT:**  Okay.  Give me a date on it.  I don't

2    have all those documents -- well, I do have a lot of

3    documents but I don't want to search through.  Just tell me

4    the date.

5          **MR. McINTOSH:**  Sorry.

6          **THE COURT:**  That's all right.  I guess I'll search,

7    too.  We'll all search for the date, the jail incident

8    report.

9          **MR. McINTOSH:**  The date of the report,

10   Your Honor -- there's two dates on here.  It says -- it's --

11   I'm going to tell you what document number it is because I

12   filed it.  It's Document No. -- oh, boy.  It's page ID

13   No. 25.  It says it was submitted on the 4th of August 2013,

14   but there's a date at the top, too, that says October the

15   20th, 2014.

16         **THE COURT:**  Yeah, but that's -- the date that it

17   was signed was August the what?

18         **LAW CLERK:**  I think it's Document 1, Exhibit 1.

19         **MR. McINTOSH:**  It was never signed.  It's a typed

20   report.  It doesn't have a signature.

21         **THE COURT:**  Okay.  So, typed report.  Do I have it?

22         **LAW CLERK:**  I don't think you do, but it's right

23   here.  (Showing document to the Court).

24         **THE COURT:**  Okay.  This is Jail Incident Narrative

25   on Sunday, August the 4th.  Okay.  The report was forwarded

1    to investigations for possible criminal charges.  The

2    officer -- "This officer requests a privilege review hearing

3    for Detainee McIntosh -- detainee rules and regulations."

4           Okay.  It says it was referred.  I don't think

5    that's anything different, Mr. McIntosh.  It said it was

6    referred for possible criminal charges.  It doesn't say as

7    to who.  And the testimony -- here you go -- of

8    Sergeant Strubberg is that they were looking for the source

9    of the drugs.  So it does say, "referred for possible

10   criminal investigation," but it doesn't say as to who.

11          So what else do you want to ask this witness?

12          **MR. McINTOSH:**  All right.  The defendant's lawyer,

13   you know, they just said that had he had the reports from me

14   that -- and they would have known it was a nurse, that the

15   investigation would have instantly been over because they

16   would have discovered the source of the contraband.

17   However, this report, the same one that --

18          **THE COURT:**  Hold on.  Tell me what your question

19   is.

20          **MR. McINTOSH:**  My question --

21          **THE COURT:**  Go ahead.

22          **MR. McINTOSH:**  My question is:  Did he know that

23   those pills that they had discovered came from the nurse's

24   formulary, from Wexford's formulary inside of the nurse's

25   office?

1          **THE COURT:**  Okay.  Very good.

2          Did you know -- he wants to know if you knew that

3    the source of the pills were the nurses at the jail?

4          **THE WITNESS:**  I recall taking the pills to the

5    nurse's office.  They used a encyclopedia of sorts to

6    look -- some of them were damaged and discolored.  I

7    remember us working our best to figure out what each of them

8    were.  I don't recall specifically if any of them were not

9    in the formulary.

10         **THE COURT:**  Okay.  So the answer is -- I don't

11   understand.  He wants to know if you knew that those were --

12   those pills came from the nurse's formulary?

13         **THE WITNESS:**  No.

14         **THE COURT:**  Okay.  The answer's no.

15         **MR. McINTOSH:**  Okay.  Had he ever seen his jail

16   incident report, the same one we just reviewed?  Had he ever

17   read it before?

18         **THE COURT:**  Read it when?  Give me a time.  You got

19   to put a time on it.  You mean as we sit here today?

20         **MR. McINTOSH:**  No, no.  Had he read it at the time

21   that he had interviewed me?

22         **THE COURT:**  Were you aware of this incident report

23   at the time you interviewed him?

24         **THE WITNESS:**  I read that report when I returned to

25   work the Monday after the incident, yes.

```
1              THE COURT:  So, no.  Yes or no, before you
2      interviewed him?
3              THE WITNESS:  Yes.
4              THE COURT:  Yes, he was aware of it.
5              MR. McINTOSH:  Okay.  Your Honor, I just want to
6      note for the record that in this report --
7              THE COURT:  I've got the report.  Don't -- we're
8      not to that right now.  These are questions for
9      Sergeant Strubberg.  We'll do the noting later.  Any other
10     questions for Sergeant Strubberg?
11             MR. McINTOSH:  Yes, sir.  In that report, did it
12     say --
13             THE COURT:  No, no, no.  Listen, time out.  We're
14     not going through -- if you have a question -- the report
15     says what it says.  I can read the report.  If you have a
16     question for Sergeant Strubberg, it's not -- I don't want
17     him to read the report.  Okay.  Go ahead.
18             MR. McINTOSH:  Did Nurse Rodriguez identify that
19     several of those pills had come from the jail's formulary?
20             THE COURT:  Did Rodriguez tell you or -- and if the
21     report says that, the report says it, but do you recall
22     Rodriguez telling you that several of those pills came from
23     the formulary?
24             THE WITNESS:  I don't recall speaking with
25     Nurse Rodriguez, no.
```

1          **THE COURT:**  Okay.  He doesn't recall speaking with

2     Rodriguez.  If the report says something different,

3     Mr. McIntosh -- the report says what it says.  He doesn't

4     recall speaking with Rodriguez.

5          **MR. McINTOSH:**  I mean, Your Honor, I just don't

6     know what to ask because I'm just getting a blanket denial.

7     I don't know how to cross-examine just a blanket *I don't*

8     *remember this.*  I mean --

9          **THE COURT:**  I understand, it's difficult.

10         **MR. McINTOSH:**  I can't defeat that.

11         **THE COURT:**  Hold on.  It's very difficult, all

12    right?  And you're stuck with the answers that witnesses

13    give you.  That's -- lawyers are stuck with the answers

14    witnesses give.  That's the way it works.

15         I will hear what you want to tell me in a second,

16    but I just want to know, before I release Strubberg, is

17    there anything else you want to ask him?  I'll hear your

18    argument in a minute.

19         **MR. McINTOSH:**  Did you ever try to prevail upon a

20    legal representative who had come to visit me at the

21    St. Clair County jail to pump me, to ask me questions

22    pertaining to your investigation, to solicit information

23    from me to give to you and to Captain Trice [phonetic]?

24         **THE COURT:**  Wait a minute.  I don't understand your

25    question.

```
 1          MR. McINTOSH:  My question --

 2          THE COURT:  Hold on, hold on.  Did he ever -- what

 3   legal representative?  I'm not understanding what you mean

 4   by "legal representative".  Are you saying that he sent a

 5   lawyer?  You want me to ask him if he sent a lawyer to ask

 6   you questions about the investigation?

 7          MR. McINTOSH:  Well, Your Honor, my lawyer had a

 8   alternative sentencing mitigation specialist come visit me

 9   at the jail.  And my question to him is did he and

10   Captain Trice inform her that I was the subject of a

11   criminal investigation and then try to ask her to ask me

12   questions about the pills that they wanted to know?  Did

13   they try to get her to solicit information from me to give

14   to them for their investigation?

15          THE COURT:  All right.  Did you ask anybody, legal

16   representative, mitigation specialist, lawyer, did you ask

17   anybody to question him about this investigation?

18          THE WITNESS:  Absolutely not, Your Honor.

19          THE COURT:  Do you know if Captain Trice asked

20   anybody?  If you know.  I'm just --

21          THE WITNESS:  Not that I'm aware of, no.

22          THE COURT:  Okay.  All right.

23          MR. McINTOSH:  After such an interview with her,

24   did you ever try to have one of your officers detain me in a

25   visiting room until you could come get me, and you and Trice
```

```
 1   re-interviewed me in another office?
 2           THE COURT:  He said -- okay.  After he --
 3           MR. McINTOSH:  This is the second interview,
 4   Your Honor.  This is not the first one referred to.
 5           THE COURT:  I got you.  Did you attempt to
 6   interview him again, do you recall?
 7           THE WITNESS:  I recall some 14 months later, when I
 8   discovered who was guilty of giving him the contraband, I
 9   asked him at that time again if he would like to speak to me
10   on camera.
11           THE COURT:  And he said?
12           THE WITNESS:  He refused to speak with me.
13           THE COURT:  He said he asked you again after they
14   completed the investigation if you'd speak to him and you
15   declined.
16           MR. McINTOSH:  How did you make contact with me to
17   try to --
18           THE COURT:  How's that relevant?  Tell me the
19   relevance of that.  That doesn't have anything to do -- no,
20   no, no.  Stop, stop.  We're only today talking about whether
21   you exhausted your administrative remedies.  We're not into
22   the merits of your case, okay?  So that's -- I'm trying to
23   figure out how that's relevant to whether you exhausted your
24   remedies.
25           MR. McINTOSH:  It goes to his credibility,
```

1    Your Honor, because -- I don't know how to do this.

2         *THE COURT:*  I understand.  I'm not going any

3    further.  That's not relevant to this.

4         *MR. McINTOSH:*  Can I ask him if he recorded the

5    first interview with me?

6         *THE COURT:*  I sure will.  Did you record the

7    interview?

8         *THE WITNESS:*  I don't recall any recording on the

9    first interview.  I just recall him refusing to speak with

10   me.

11        *THE COURT:*  Okay.  He doesn't recall.  If that

12   interview is recorded, you have to produce that, so -- but

13   he doesn't recall it being recorded, but if it was, I'm

14   going to order him to produce that.  Okay.

15        *MR. McINTOSH:*  Do they have that same computer

16   system that existed in his -- because this is what they

17   recorded me on.

18        *THE COURT:*  Look, look, look.  This is not relevant

19   to exhaustion, all right?  I'm giving you leeway.

20        *MR. McINTOSH:*  -- show what he told me.  It's going

21   to show what he told me.

22        *THE COURT:*  All right.  If -- Mr. McIntosh, if

23   there is a recording, there is a duty to produce it.  And

24   I'm -- and Mr. Sharp is the lawyer, he recognizes the duty.

25   If there's a recording, I want it.

1        *MR. SHARP:*  I would not have possession of that,

2   Your Honor, because -- I can certainly inquire from the

3   county whether or not they have it and let the Court know

4   what I learn.

5        *THE COURT:*  Time out.  We've got all the parties

6   here.  I want to know in five days if there's a recording,

7   period.  All right.  If there's a recording, there's a

8   recording, the Court will get it.

9        *MR. McINTOSH:*  Yes, sir.

10       *THE COURT:*  All right.  Thanks, Sergeant.

11       *THE WITNESS:*  Thank you, Your Honor.

12       *THE COURT:*  All right.  Now, Mr. McIntosh, I do

13  realize that you have given me some affidavits of folks who

14  support your position, and the Court has those.

15       *MR. McINTOSH:*  Yes, sir.

16       *THE COURT:*  Okay.

17       *MR. SHARP:*  Your Honor, may I -- before

18  Sergeant Strubberg leaves, can I make certain that the

19  proffer that I offered earlier will be considered by the

20  Court of what his testimony would be?

21       *THE COURT:*  Yeah.  He didn't --

22       *MR. SHARP:*  I didn't get a chance to ask him any

23  questions.

24       *THE COURT:*  You're right.  Sergeant Strubberg is

25  still in the court.  Sergeant Strubberg, consider yourself

```
 1   still under oath.  You adopt the proffer that Mr. Sharp
 2   presented to the Court?
 3              THE WITNESS:  I do.
 4         MR. SHARP:  Can I briefly examine him on two
 5   questions, Your Honor?
 6              THE COURT:  What questions?  What else we need to
 7   know?
 8              MR. SHARP:  One is -- what the Court hasn't been
 9   told in evidence is what the contraband consisted of.
10              THE COURT:  Not necessary.  That's irrelevant.
11         MR. SHARP:  Okay.  And then two is -- well, I'll
12   explain later why it is, but two is, what the investigation
13   did.
14              THE COURT:  Explain to me now why what he had is
15   relevant when the issue is, did he exhaust his remedies?
16              MR. SHARP:  Because, Your Honor, this is going to
17   come down to an issue of credibility between Mr. McIntosh
18   and Sergeant Strubberg, and it's not just a matter of
19   credibility but it's also what reasonable inferences can be
20   drawn from the evidence.  Sergeant Strubberg would tell the
21   Court that an extensive investigation was done that led them
22   to other people away from the infirmary, and that if the
23   sergeant had had these documents identifying the nurse, it
24   would have been a different result.
25              THE COURT:  You told me that 20 minutes ago.  I'm
```

1   trying not to be impatient, but, man, you told me that.  And

2   I'm trying to get to the point of what I need to hear, and

3   you and Mr. McIntosh are telling me stuff I don't need to

4   hear.  Okay.  All right.  Here we go.  I'm trying not to be

5   impatient but it's very difficult.

6          Okay.  What Mr. McIntosh tells me in his verified

7   complaint is that he had taken 10 to 15 pills at the time he

8   was suicidal.  He had suffered a head injury and was

9   unconscious during the 24 hours that you guys say he should

10  have filed a grievance.

11         Okay.  Is there any -- do you have any evidence to

12  the contrary that goes to his state of being?

13         **MR. SHARP:**  Yes.  That's inconsistent with the

14  position he's taken when he claims that he completed a

15  5-page exhibit on the evening of August 4th, or 8-page

16  exhibit on the evening of August 4th, as well as an exhibit

17  the following day.

18         And, Your Honor, to add to our argument, it's not

19  just -- the fact of the matter is, the first grievance that

20  Mr. McIntosh claims to have filed, whether it's a grievance

21  or a captain's complaint, was on August 4th after he was

22  caught with the contraband.  He says that he'd been given

23  these materials for months.  No grievances were submitted by

24  him during any of that period.

25         **THE COURT:**  I got you.  The answer to my question

1    is you pointed me to the exhibits that he filed.

2         **MR. SHARP:**  Thank you.

3         **THE COURT:**  All right.  So we've heard from

4    Sergeant Strubberg.

5         And come back, Sergeant Strubberg.  I'm sorry.

6    This is my fault.  I should have looked at my questions

7    before I let you go, and I apologize.

8    **(Witness re-takes the stand)**

9         **THE COURT:**  I'm just trying to get the timeline

10   down.  You recall you're still under oath?

11        **THE WITNESS:**  Yes, Your Honor.

12        **THE COURT:**  Okay.  When you first talked to

13   Mr. McIntosh, when you first talked to him, had the suicide

14   attempt happened at that point or was it after that?

15        **THE WITNESS:**  Your Honor, I'm not familiar with

16   when the suicide attempt occurred.  I can tell you I spoke

17   with him Monday or Tuesday when I came in after -- the

18   incident occurred on the weekend.

19        **THE COURT:**  Okay.  Mr. McIntosh, was -- and you can

20   tell me, was this suicide attempt before or after you talked

21   to Sergeant Strubberg?

22        **MR. McINTOSH:**  It was before, Your Honor.

23        **THE COURT:**  Before, okay.  All right.  Okay.  And

24   just tell me -- I do need to know a little bit about that.

25   I mean I've got it in there but I want to hear it from you.

```
 1              What happened after the suicide attempt?  Were you
 2    treated medically?
 3              MR. McINTOSH:  No, Your Honor.  I remained
 4    unconscious until about, I want to say about perhaps
 5    11:30 or so the next day.
 6              THE COURT:  1130 a.m. or p.m.?  Morning or --
 7              MR. McINTOSH:  A.m., Your Honor.
 8              THE COURT:  A.m.  So -- okay.  11:30 a.m. the next
 9    day.  Okay.  Now, how long after that -- I'm just trying to
10    get a timeline down.  How long after that -- was it the next
11    day you talked to Sergeant Strubberg?
12              MR. McINTOSH:  Yes, Your Honor.  I believe it was,
13    yes, sir.
14              THE COURT:  Okay.  All right.  That's what I'm
15    trying to find out.
16              Okay.  I have the affidavits from your witnesses,
17    Mr. McIntosh, and they're affidavits, they're taken under
18    oath, so they are evidence, where they say that they heard
19    Sergeant Strubberg tell you that you had to wait until the
20    investigation was complete to file a grievance.  Okay.  You
21    filed another affidavit, I don't think that one was
22    relevant, but the two are relevant, and the Court will
23    consider them as evidence.
24              I'm sorry, Sergeant.  That's all I needed.  Okay.
25    You're excused again.
```

```
 1              All right.  Now, it's your motion, Mr. Sharp.  Tell
 2      me what else I need to know.
 3              MR. SHARP:  There was no witness to the alleged
 4      suicide attempt.  And, again, Mr. McIntosh's testimony is
 5      inconsistent with the notion that he filed these two
 6      captain's complaints.  I hope that the Court certainly isn't
 7      going to reward him for filing these documents which he
 8      claims were handed to him by Sergeant Strubberg because,
 9      Your Honor, that's what it boils down to:  Who do you
10      believe?
11              THE COURT:  Well --
12              MR. SHARP:  Mr. McIntosh or Sergeant Strubberg?
13      And if you look at these exhibits, Your Honor, you'll see
14      that in the first one Mr. McIntosh says, "I sent in a
15      captain's request complaint about the shakedown that caused
16      me to be sent to segregation and put on administrative
17      lockdown because some pills were found in the infirmary
18      which had been given to me by one of the nurses for months
19      now."  And then the second one has even more allegations
20      regarding the nurse.  It says, "The nurse was giving me the
21      pills while she was working in front of others."  And the
22      simple fact of the matter is it's not --
23              THE COURT:  Listen, I understand your argument.
24              MR. SHARP:  It's not simply a matter of
25      credibility, but a reasonable inference from the evidence.
```

1  The documentary evidence is that these were never submitted

2  because it wouldn't have taken St. Clair County 14 months.

3          **THE COURT:**  There's no jury here.  There's no jury

4  here.  I got your argument on that, and if you tell me five

5  times, it doesn't change.  I heard it the first four.  I got

6  your argument.

7          Mr. Huber, tell me something that I haven't heard.

8          **MR. HUBER:**  The only thing I would add, Your Honor,

9  is that plaintiff failed to even file one grievance, and,

10  therefore, he can't claim that the grievance process at

11  St. Clair County was defective or didn't work because he

12  never even tried to avail himself of it.  By failing to file

13  any grievance whatsoever he can't say it didn't work or it

14  wasn't right because he didn't even try.

15          The only grievances we have are from January 25th

16  and 26th, which is just days before he left.  So right

17  before he leaves St. Clair County he decides to file a

18  couple captain's requests.  There's nothing before that and

19  there's no reason to believe that these grievances --

20  there's nothing on there to show that they were seen by

21  anyone or even submitted.

22          **THE COURT:**  Okay.  All right.  And, Mr. McIntosh,

23  you get the last word.

24          **MR. McINTOSH:**  Okay.  Your Honor, I just wanted to

25  point out -- first of all, I just want to say I really don't

McIntosh vs. Wexford, #17-103

8/15/18 - Pg. 33

1    know what I'm doing because this hearing is kind of taking a

2    turn where I almost don't even know what we're talking about

3    any more.

4         **THE COURT:**  Let me tell you.  Let me be perfectly

5    clear, okay?  We are talking about:  Did you try to file a

6    grievance at St. Clair County?  Not whether you had pills,

7    not whether they were investigating you, not whether any of

8    those things, okay?  Not whether the investigation took 14

9    months.  Did you try to exhaust -- did you try to file a

10   grievance at the St. Clair County jail?  That's all we're

11   talking about, okay?

12        **MR. McINTOSH:**  Yes, sir, I did.  And you will

13   notice that these grievance exhibits, the first one contains

14   an actual printed captain's request form.  They've never

15   explained how I got these.  They're citing that these

16   grievances are inconsistent with the others because the

17   others had responses on them.  The problem is that the

18   grievance procedure at the --

19        **THE COURT:**  Slow down, slow down, slow down.  I got

20   a court reporter.  Slow down.

21        **MR. McINTOSH:**  The problem is that the grievance

22   system at the St. Clair County jail was designed to not

23   allow me to produce copies with signatures on them.  They

24   would not make copies of them after -- they would not

25   provide you with a copy of them.  I happened to get these

1    from Strubberg because he handed them back to me; thus,

2    they're faulting me for a system that was designed to

3    produce no paper trail.

4           **THE COURT:**  I understand.

5           **MR. McINTOSH:**  I would like --

6           **THE COURT:**  I understand.  Wait a minute.  If you

7    were listening, you heard me question the lawyer about the

8    process at the very beginning.  I understand your argument

9    that the process is faulty.  I got that.

10          **MR. McINTOSH:**  And the thing is, I've made specific

11   allegations.  I've given you dates, I've given you times,

12   I've given you conversations, I've given you quotations

13   because these things are true.  I don't know how to defeat

14   just a general denial coupled with some "I don't recalls."

15   I mean there's really no way around that.

16          **THE COURT:**  Well, you got to understand --

17          **MR. McINTOSH:**  -- except he has a bad memory.

18          **THE COURT:**  All right.  Listen.  Listen.  Listen to

19   me, okay?  This is a motion for summary judgment, and I

20   recognize -- listen, I want to clear up some other business

21   before I tell you this.  And I think I did this last time

22   but I'm not sure if it's still showing up in the docket,

23   your request for an attorney, and I denied that.  And if I

24   haven't denied it before, I'm denying it today.

25          Understand that if we get deeper into the process

1    you can always ask again, all right?  This is a motion for

2    summary judgment.  The standard is the facts are construed

3    in the light most favorable to the plaintiff.  That's you,

4    okay?

5              **MR. McINTOSH:**  Yes, sir.

6              **THE COURT:**  So, understand we're not talking about

7    the merits of your case; we're only talking about, is there

8    enough before the Court to defeat a motion for summary

9    judgment?

10             All right.  Thank you very much.  I hope I

11   wasn't -- it's late in the day and, you know, after 3:00 my

12   blood sugar fluctuates, so if I was -- yes, sir?

13             **MR. McINTOSH:**  I just wanted to say one final

14   thing, Your Honor, that the only reason I asked about the

15   thing about the legal representative is because if they were

16   called to testify they would tell you that he and Trice did

17   try to pump -- to get her to solicit information from me.

18             See, you know, I kind of agree with the defendants

19   one thing, that it does turn on his credibility, and the

20   problem is that he's really testifying to absolutely

21   nothing, coupled with some "I don't recalls."  And the only

22   way for me to be able to bring the issue of credibility

23   before the Court so that you can determine who's telling the

24   truth and who's not is to impeach some of these things that

25   he's saying that I know that I can't impeach, and at this

1    hearing I'm just not able to do that in a way in which I

2    would like, Your Honor, and that was the only reason I

3    brought those issues up.

4           And I'd like to point out one last thing,

5    Your Honor.  You know, they've constantly said that had he

6    seen those grievances he would have known it was a nurse and

7    that the investigation would have been over.  I just wanted

8    to direct your attention that this report, the nurse said --

9    she advised that several of these medications -- I quote

10   this: Nurse Rodriguez, who was one of the defendants, "also

11   advised that several of these medications are not used by

12   the jail and are not in the formulary."

13          It goes on to say that only one person in the

14   Infirmary 2 was prescribed Naproxen, and he had been on it

15   for two days.  Okay.  If she's saying that several of the

16   medications are not provided by the jail, she's also

17   admitting that several were provided by the jail.  He's

18   testified that he saw this report before he interviewed me;

19   therefore, he knew very well that the source of it had been

20   a nurse because how else would I have gotten into the

21   formulary?

22          **THE COURT:**  I got you.  Okay.  All right.  Very

23   good.  Thank you.  We'll get an order out as quickly as we

24   can.  Court's in recess.

25          *(Proceedings adjourned at 4:54 p.m.)*

1     **REPORTER'S CERTIFICATE**

2

3        I, Laura A. Esposito, RPR, CRR, CRC, Official Court
     Reporter for the U.S. District Court, Southern District of
     Illinois, do hereby certify that I reported in shorthand the
4     proceedings contained in the foregoing 37 pages, and that
     the same is a full, true, correct, and complete transcript
5     from the record of proceedings in the above-entitled matter.

6        Dated this 25th day of October, 2018.

7

8        *Laura A. Esposito*          Digitally signed by Laura
                                      Esposito
                                      Date: 2018.10.25 15:31:31
                                      -05'00'
9     _____
     LAURA A. ESPOSITO, RPR, CRR, CRC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

McIntosh vs. Wexford, #17-103

                                           8/15/18 - Pg. 38