## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DALLAS McINTOSH, #B85114,    )
               )
          **Plaintiff,**  )
               )
vs.             )  **Case No. 17-cv-00103-JPG**
               )
WEXFORD HEALTH SOURCES, INC.,  )
NANCY KEEN, and       )
BARBARA RODRIGUEZ,     )
               )
        **Defendants.**  )

## MEMORANDUM & ORDER

**GILBERT, District Judge:**

This matter is on remand from the Seventh Circuit Court of Appeals for a *de novo* evidentiary hearing on Defendants Nancy Keen, Barbara Rodriquez, and Wexford Health Sources, Inc.'s motions for summary judgment on the issue of exhaustion of administrative remedies (Docs. 61 and 69) pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). *See McIntosh v. Wexford Health Sources, Inc., et al.*, App. No. 19-1095 (7th Cir. Feb. 5, 2021). The Court conducted this hearing via videoconference on November 3, 2021. Based on the submissions of the parties and the evidence and testimony presented at the hearing, the Court now finds that Plaintiff Dallas McIntosh exhausted his available administrative remedies before bringing suit. Accordingly, Defendants' Motions for Summary Judgment (Docs. 61 and 69) shall be denied, and Count 1 against Nurses Keen and Rodriguez and Count 2 against Wexford Health Sources, Inc. shall proceed.

### BACKGROUND

In February 2017, McIntosh filed suit against Wexford Health Sources ("Wexford") and St. Clair County Jail officials pursuant to 42 U.S.C. § 1983 for their "deliberate indifference" to

his serious medical and mental health needs and their failure to protect him from inflicting self harm, in violation of the Fourteenth Amendment.  (Doc. 1).

In the Complaint, McIntosh alleged that he was recovering from surgery for multiple gunshot wounds to his abdomen when he transferred to the Jail on October 12, 2012.  (*Id*. at 5). Due to his poor health, McIntosh was housed in the infirmary while he awaited trial.  (*Id*.). Sometime around February 8, 2013, Jail officials discovered a suicide note in McIntosh's possessions.  (*Id*.).  At the time of the discovery, Nurse Keen was on duty.  (*Id*.).  She was assigned to McIntosh's care when he was transferred to a suicide watch room and placed in a restraint chair. (*Id*.).  Thereafter, Nurse Keen began slipping McIntosh illicit prescription medication, consisting of sleeping pills, antidepressants, opioids, and other painkillers.  (*Id*. at 8).  She told him that the medication would make him feel better.  (*Id*.).  During the next six months, McIntosh became heavily addicted to the drugs.  He required increased quantities of them, and the nurse regularly supplied him with several days of medication for use between her shifts.  (*Id*.).

For six months, McIntosh remained in a drug-induced state.  (*Id*. at 9).  For the first six weeks after he began taking Nurse Keen's recommended cocktail of medications, he suffered excruciating headaches, stomach cramps, diarrhea, nausea, and vomiting with blood.  (*Id*.).  He then began feeling confusion, grief, depression, and anger.  (*Id*.).  The medications caused him to sleep through two or three meals per day, resulting in significant weight loss and eventual placement on a high calorie diet.  (*Id*.).

On or around August 4, 2013, officers searched the infirmary and found approximately 55 pills in McIntosh's property.  (*Id*. at 9-10).  He was transferred to punitive segregation pursuant to Major McLaurin's orders the same day.  (*Id*. at 10-11, 14).  Before transferring him, the two on-duty nurses, Nurses Keen and Rodriguez, failed to screen McIntosh for addiction, withdrawal, or

suicidal ideations. (*Id*. at 10). They also failed to search his mattress for additional contraband. As it turns out, his mattress contained an undiscovered bundle of 10-15 pills. (*Id*. at 11).

Once in punitive segregation, McIntosh sent out a "grievance" to complain about the pills that the nurse had given him during the past six months. (*Id*.). He then asked to speak with someone about increased feelings of depression. (*Id*.). When no one responded, McIntosh took the remaining pills and attempted to hang himself using a bed sheet. (*Id*.). The sheet gave way, and McIntosh fell to the floor, struck his head, and lost consciousness for more than a day. (*Id*.). This was the first time McIntosh attempted to take his life, and he blames the prescription drug addiction for his suicide attempt. (*Id*. at 12).

In the days that followed, Sergeant Strubberg informed McIntosh that he was under criminal investigation for the pills discovered in his property. (*Id*.). McIntosh claims that he protested and asked to file a grievance. (*Id*.). However, Sergeant Strubberg told him that the "first step" in the grievance process was completion of the criminal investigation. (*Id*. at 12-13). That investigation did not wrap up until fourteen months later—after McIntosh transferred into the custody of the Illinois Department of Corrections. (*Id*.).

McIntosh brought this lawsuit against the defendants for failing to protect him from the serious risk of addiction and suicide from February to August 2013. (Doc. 1). The following Fourteenth Amendment claims[1] survived screening under 28 U.S.C. § 1915A and remained pending at the time of the original *Pavey* hearing:

> **Count 1:** Nurse Keen and Nurse Rodriguez failed to protect McIntosh from addiction to prescription drugs and attempted suicide during his pretrial detention at the Jail;
>
> **Count 2:** Wexford had the following policies that caused the violation of McIntosh's rights to occur: (a) providing inadequate training to employees regarding

---

[1] The Fourteenth Amendment objective unreasonableness standard articulated in *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018), governs these claims.

suicide prevention and prescription drug handling; (b) failing to supervise employees and fully vet candidates during the hiring process; and (c) failing to maintain procedural safeguards to monitor prescription pill use at the Jail.

(*See* Doc. 9).[2]

Defendants Keen, Rodriguez, and Wexford then filed for summary judgment on the issue of exhaustion, and the motions were referred to a magistrate judge for an evidentiary hearing pursuant to *Pavey*. (Docs. 61 and 69). United States Magistrate Judge Donald G. Wilkerson conducted a *Pavey* hearing over the course of two days on July 16, 2018 and August 15, 2018. At the conclusion of the hearing, Magistrate Judge Wilkerson entered a Report and Recommendation for the denial of summary judgment, after finding McIntosh's testimony regarding exhaustion credible. (Doc. 127). Defendants objected. (Doc. 128).

After reviewing both hearing transcripts and the submissions of the parties, this Court found McIntosh's testimony lacking in credibility. In reaching this conclusion, this Court excluded two affidavits offered by McIntosh, *i.e.*, the Declarations of McCallum and Gully, as inadmissible hearsay. Defendants were granted summary judgment.

On appeal, the Seventh Circuit held that this Court's decision hinged on credibility determinations that necessitated a *de novo* evidentiary hearing. *See McIntosh v. Wexford Health Sources, Inc., et al.*, App. No. 19-1095 (7th Cir. Feb. 5, 2021). The Court of Appeals further indicated that the two inmate affidavits offered in support of McIntosh's position were not inadmissible hearsay because they were not offered for the truth of the matter asserted but rather the effect they had on the listener. This matter was remanded for a new hearing and determination on Defendants' motions for summary judgment. *Id*.

---

[2] Several other defendants and claims were dismissed pursuant to a settlement agreement. (Docs. 93-94).

## LEGAL STANDARDS

Lawsuits filed by inmates are governed by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  The PLRA states, in no uncertain terms, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   Exhaustion of available administrative remedies is a precondition to suit, and the Supreme Court has interpreted the PLRA to require "proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).  This means "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."   *Woodford*, 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).   An inmate must "file complaints and appeals in the place, and at the time, the prison's administrative rules require."  *Pozo*, 286 F.3d at 1025.

Strict compliance with a Jail's grievance process is required.  *Locket v. Bonson*, 937 F.3d 1016, 1025 (7th Cir. 2019).  The purpose of the PLRA's exhaustion requirement is to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id*. at 93.  The requirement allows the Jail's administration an opportunity to fix the problem and mitigate the damage to a plaintiff.  *Pozo*, 286 F.3d at 1023-24.  Allowing otherwise would frustrate the purpose of the grievance process.  *Porter v. Nussle*, 534 U.S. 516, 526 (2002).

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A summary

judgment motion based on failure to exhaust administrative remedies typically requires a hearing to decide any contested issues regarding exhaustion, and a judge may make limited findings at that time. *Pavey v. Conley*, 544 F.3d at 742. "[D]ebatable factual issues relating to the defense of failure to exhaust administrative remedies" are decided by the judge and not a jury. *Id*. at 740-41.

### THE GRIEVANCE PROCEDURE

During the relevant time period, St. Clair County Jail had a grievance procedure in place, and it was set forth in the "Detainee Rules and Regulations Manual." (Docs. 62-1, 62-2, 62-3). Before submitting a formal grievance, a detainee was first required to submit a "Captain's Request." (Doc. 62-1, p. 9; Doc. 62-2, p. 8; Doc. 62-3, p. 10). The Captain's Request is a written document submitted to a shift supervisor who, in turn, submits the form to the Captain. (*Id*.). Inmates must separately submit a formal grievance to the shift supervisor within 24 hours of the circumstances or conditions prompting the grievance. (*Id*.). The shift supervisor passes the grievance to the immediate supervisor, who has three days to respond. (*Id*.). A detainee then appeals to the Assistant Jail Superintendent, who is responsible for issuing a final decision. (*Id*.).

### ANALYSIS

*De novo* review of this matter persuades the Court that McIntosh made every effort he could to exhaust available administrative remedies before bringing suit, and any failure to initiate the formal grievance process was not his fault.

On the date he transferred to punitive segregation for possession of contraband, *i.e.*, August 4, 2013, McIntosh requested a captain's request form and a grievance form from staff. He made this request of Officer Dante Beatty, who returned with a captain's request form but no grievance form. The officer explained that a grievance form would be provided along with a response to the captain's request. Upon his receipt of the form from Officer Beatty, McIntosh prepared a multi-

6

page captain's request and submitted it to Officer Beatty for processing—a chain of events that is certainly consistent with common sense.

McIntosh received no response to the request, and he attempted suicide the same day.  In the process, he lost consciousness.  When he regained consciousness the following day, McIntosh submitted a "follow-up grievance" on lined paper.  He also received no response to this.

It is undisputed that McIntosh never submitted a formal grievance form, but this was due to no fault of his own.   According to all of his submissions and credible testimony, McIntosh was provided with no grievance form by Officer Beatty or anyone else.  The officer explained that a form would be provided along with a response to the captain's request.  However, no response was provided to the captain's request or follow-up grievance, and no grievance form was provided.

On August 6, 2013, McIntosh spoke with Sergeant Strubberg and learned, for the first time, that he was the subject of a criminal investigation arising from his possession of contraband. McIntosh also learned that he could not proceed any further with the grievance process until the investigation was completed.  McIntosh testified that Sergeant Strubberg generally acknowledged receipt of forms from him during this conversation and even handed the captain's request back to him; Strubberg testified that he never received a captain's request from McIntosh at all and argues that this is because McIntosh never submitted one.   However, this argument ignores McIntosh's testimony that he submitted the captain's request to someone else altogether—Officer Beatty.

McIntosh also learned from Sergeant Strubberg that the grievance process was different in the case of a criminal investigation – it was essentially paused pending the outcome of the investigation.  McIntosh's subsequent inquiries into the status of this investigation with Sergeant Strubberg on 5-7 occasions thereafter revealed that the investigation remained ongoing.  It is undisputed that the investigation did not wrap up until fourteen months later—after McIntosh

7

transferred into the custody of the Illinois Department of Corrections.  As McIntosh explained at the *de novo* hearing and as the declarations of his fellow inmates supports, he understood that the criminal investigation effectively halted the grievance process.

While it is true that exhaustion is a "precondition to suit" and dismissal is appropriate if a plaintiff fails to satisfy that condition, exhaustion as a precondition is limited to those remedies that are "available." *Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013); *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005) (quoting *Perez v. Wis. Dept. of Corr.*,182 F.3d 532, 535 (7th Cir. 1999)).  A grievance procedure is considered available if it is "capable of use" to obtain "some relief for the action complained of."  *Booth v. Churner*, 532 U.S. 731, 738 (2001).  The question posed by the underlying case is whether the process was actually available to McIntosh.

A grievance process is considered unavailable in three situations: (a) when it operates as a simple dead end because officers are either unable or unwilling to provide any relief to aggrieved inmates; (b) when prison administrators thwart inmates from taking advantage of the grievance process through misrepresentation, intimidation, or other machinations; and (c) when the administrative scheme is so opaque that it becomes essentially incapable of use.  *Ross v. Blake*, -- U.S. --, 136 S.Ct. 1850, 1858-60 (2016).   The Court is persuaded that the St. Clair County grievance process was unavailable to McIntosh in connection with this matter.  McIntosh took what steps he could to initiate this process, by submitting a captain's request and follow-up grievance on August 4-5, 2013.  From there, the grievance process was rendered unavailable by inconsistent instructions from staff regarding the proper procedure to follow while the outstanding captain's request and criminal investigation remained pending.

At this stage of proceedings, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008).  When applying this standard to the evidence presented, the Court finds that Defendants have not carried their burden of proving that McIntosh failed to exhaust his available administrative remedies before bringing suit.  On the contrary, McIntosh took each of the steps available to him when he submitted a captain's request and follow-up complaint on or around August 4-5, 2013.  His failure to file a formal grievance on the correct form was no fault of his own.  Defendants' motions for summary judgment (Docs. 61 and 69) shall now be **DENIED**.

### DISPOSITION

**IT IS ORDERED** that Defendants' Motions for Summary Judgment for Failure to Exhaust Administrative Remedies (Docs. 61 and 69) are **DENIED**.  **COUNT 1** against Nurses Keen and Rodriguez and **COUNT 2** against Wexford Health Sources, Inc. shall proceed.  The Court will enter a separate Scheduling and Discovery Order.

**IT IS SO ORDERED.**

**DATED: 11/8/2021**

s/J. Phil Gilbert
**J. PHIL GILBERT**
**United States District Judge**

9