UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DALLAS MCINTOSH,

    Plaintiff,

  v.

WEXFORD HEALTH SOURCES, INC.,
NANCY KEEN, and BARBARA RODRIGUEZ,

    Defendants.

Case No. 3:17-cv-103-JPG

**MEMORANDUM AND ORDER**

This matter comes before the Court on two motions for summary judgment. The first was filed by defendant Nancy Keen (Doc. 210). Plaintiff Dallas McIntosh has responded to that motion (Doc. 217), and Nurse Keen has replied to that response (Doc. 221). The second was filed by defendants Wexford Health Sources, Inc. ("Wexford") and Barbara Rodriguez (Doc. 213). McIntosh has responded to that motion (Doc. 222), and Wexford and Nurse Rodriguez have replied to that response (Doc. 225). The claims for which summary judgment is sought—Counts 1 and 2—are the only remaining claims in this case.

McIntosh filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983 complaining of his conditions of confinement while he was a pretrial detainee at the St. Clair County Jail ("Jail") beginning in October 2012. Count 1 of his Complaint is against Nurse Keen and Nurse Rodriguez, two nurses working at the Jail while McIntosh was housed there. In Count 1 McIntosh alleges the nurses provided inadequate care for his medical needs when he was recovering from gunshot wounds and failed to protect him from becoming addicted to prescription drugs and from attempting to commit suicide as a consequence of that addiction. Count 2 remains against Wexford for failing to train employees in suicide prevention and in the

proper handling of prescription medication; for failing to implement procedures to control the outflow of prescription medications; and for failing to adequately screen applicants for employment. McIntosh asserts that by so acting, the defendants violated his Fourteenth Amendment due process rights.

The Court will grant summary judgment on one claim for Nurse Rodriguez and Nurse Keen because no evidence suggests they provided constitutionally inadequate care to McIntosh with respect to recognizing his risk of suicide. On the other hand, the Court will deny summary judgment on another claim against Nurse Keen, whom the evidence shows provided McIntosh with prescription drugs that were not prescribed for him and that caused adverse effects, including contributing to his suicide attempt. As for Wexford, there is no evidence of a widespread practice of constitutional violations to which Wexford was deliberately indifferent.

I.     **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the burden of establishing that no material facts are genuinely disputed. *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party. *Id.*

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Hansen v. Fincantieri Marine Grp.*, 763 F.3d 832, 836 (7th Cir. 2014).

Once a properly supported motion for summary judgment is filed, the adverse party

"must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotations omitted). The Court must then "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836 (internal quotations omitted). If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

The Court first addresses the potential liability of Nurse Keen and Nurse Rodriguez as individuals, then moves on to the potential liability of Wexford as an organization.

## II. Individual Defendants

### A. Facts

Viewing the evidence and the reasonable inferences that can be drawn from it in McIntosh's favor, the evidence establishes the following relevant facts for the purposes of this motion.

McIntosh was received in the Jail in October 2012 after being treated at St. Louis University Hospital for multiple gunshot wounds to the abdomen. He arrived at the Jail in poor physical condition and feeling depressed and stressed, so he was assigned to the infirmary, where Nurse Keen worked as part of her employment by Wexford. Shortly after his arrival at the Jail, medical personnel prescribed him Tylenol, and there is no notation of pain on any of his daily medical notes. He also saw a psychologist, to whom he denied suicidal ideation.

In a February 8, 2013, shakedown of McIntosh's area in the infirmary, Jail officials found an undated suicide letter written by McIntosh. McIntosh told Jail officials he had written the note several weeks before that date, had forgotten about it, and was not suicidal when the letter

was found. Nevertheless, Jail officials placed McIntosh in the "quiet room," the area where detainees determined to be at suicide risk were held. He was held in a restraint chair for nearly 23 hours where Nurse Keen and Nurse Rodriguez cared for him and periodically checked on his restraints. He was then released back to the infirmary after an assessment by psychological staff. No further assessment for suicidal risk was performed.

After McIntosh was returned to the infirmary, Nurse Keen began dispensing medication to help McIntosh's back pain, telling him she would help him in the best way she could.[1] She first began to do this using the standard medication dispensing procedures even though McIntosh was not prescribed any medication at the time. After about a month she began giving him medications in the leftover dietary bags often distributed to infirmary detainees. She included medications in McIntosh's bag in larger and larger quantities to "hold him over" until her next shift. She would instruct him about how and when to take the pills to make him feel better. As a licensed practical nurse, she was not qualified to prescribe medication, only to dispense medication prescribed by others. McIntosh took the unprescribed medications anyway because he thought Nurse Keen was trying to help him. Nurse Keen also gave McIntosh lighters and

---

[1] Nurse Keen objects to McIntosh's testimony in this regard as "self-serving" and suggests it is therefore unable to withstand summary judgment. This is based on a misconception. Courts routinely find that a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). Cases that have made the statement that self-serving, uncorroborated and conclusory affidavits are not sufficient to withstand summary judgment have found the particular affidavits in issue insufficient not because they were self-serving but because they were not made on personal knowledge. *Id.* at 772. In truth,
> [p]rovided that the evidence meets the usual requirements for evidence presented on summary judgment— including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material fact.

*Id.* at 773. Much of McIntosh's evidence in this case satisfies this standard, and the Court will therefore consider it in opposition to the motions for summary judgment.

cigarettes to hold for her, and she would get them from him later on.

McIntosh believes the medication Nurse Keen gave him caused him to vomit in late February 2013.  He also believes he became addicted to the medication, which caused him negative effects for six months, including headaches, stomach pains, diarrhea, cramps, nausea, mood swings, feeling of grief, depression, sadness, anger, increased suicidal ideations, an altered sleep schedule, lack of appetite, and missed meals.  The symptoms he suffered were consistent with the side effects of some of the unprescribed drugs Nurse Keen provided to him.  Alternatively, he claims some of those symptoms were withdrawal symptoms.  At Nurse Keen's request, McIntosh told no one but her that he was having these symptoms, and they were not recorded in the daily medical staff observations of McIntosh.

Another shakedown of the infirmary was conducted on the morning of August 4, 2013, and this time Jail officers found 55 contraband pills—prescription medication that had not been prescribed to McIntosh—in McIntosh's possession that he had accumulated over time.  Nurse Rodriguez confirmed the identity of the medications, that none of them had been prescribed to McIntosh, and that some were not even used at the Jail, although it was possible they were in the Jail because they had been confiscated from detainees entering the Jail.  She did not know how McIntosh had gotten them.  The shakedown also found lighters, rolling papers, and cigarettes in McIntosh's possession.  Jail officials began an investigation of how McIntosh came to possess the contraband.

When the contraband was found, McIntosh was immediately sent to segregation.  Even though she knew McIntosh had been restrained against possible suicide in February 2013, Nurse Rodriguez did not have any concerns about McIntosh's mental health or any addiction to the contraband medications.  Ordinarily, when Nurse Rodriguez had a concern, or was notified by

5

Jail staff of a concern, that a detainee was suicidal, she would notify the Jail's counselor and doctor, who would evaluate and monitor the detainee's mental health as needed. McIntosh had never told Nurse Rodriguez about the unprescribed drugs he had been taking or symptoms he attributed to them or that he was suicidal. As a consequence, Nurse Rodriguez did not conduct or ask a Jail mental health counselor to conduct a suicide risk assessment before McIntosh was placed in segregation. Indeed, McIntosh was not suicidal when he initially entered segregation, but suicidal ideation developed throughout the time he was confined there. .

Jail officials allowed McIntosh to take his mattress from the infirmary into the segregation cell with him without subjecting it to a search for additional contraband. It contained another stash of pills that McIntosh took the first night he was in segregation. As he began taking the pills only to help him sleep, he became suicidal, took them all, and then tried unsuccessfully to hang himself. Instead, he hit his head on the bunk and became sick afterwards. Jail medical personnel checked on McIntosh every other day. There is no record of this suicide attempt in McIntosh's Jail records. After McIntosh was placed in segregation, he experienced symptoms he attributed to withdrawal from the unprescribed prescription medications Nurse Keen had been giving him: sweating a lot, getting sick, urinating during sleep, and muscle and bone aches.

More than a year after the contraband was found in the infirmary, Jail investigators concluded that Nurse Keen had provided at least some of the contraband to McIntosh, including some of the unprescribed medication. This conclusion was supported by an October 2014 report from another detainee that Nurse Keen had provided contraband to him and McIntosh, including cigarettes, lighters, cannabis, prescription medication, and a handcuff key. Nurse Keen admitted that she had provided rolling papers, a lighter, and a pack of cigarettes but not the handcuff key

or any medication beyond what McIntosh was prescribed.  She claimed she gave McIntosh contraband because he threatened to use personal information he had discovered about her if she did not, and she claimed she did not report McIntosh's threats to the Jail because she did not trust the Jail deputies.  Nurse Keen left her job at the Jail in October 2018.

McIntosh seeks to recover for mental, emotional, and physiological damage from taking the unprescribed medications as well as the physical damage when he hit his head after his unsuccessful suicide attempt.

    B.    <u>Legal Standard</u>

To prevail on a § 1983 claim for inadequate medical care, a plaintiff must prove he had an objectively serious medical need and the defendant had a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Gonzalez v. McHenry Cnty., Ill.*, 40 F.4th 824, 828 (7th Cir. 2022).

With respect to the culpable state of mind requirement, McIntosh's claim against Nurse Keen and Nurse Rodriguez are governed by the objective reasonableness standard.  Relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Seventh Circuit Court of Appeals holds that the objective reasonableness standard applies to all Fourteenth Amendment conditions of confinement claims brought by pretrial detainees. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).  This includes claims of inadequate medical care.  *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

The controlling inquiry in the medical context has two steps.  The first focuses on the intentionality of the defendant's conduct and asks "whether the medical defendant[] acted purposefully, knowingly, or perhaps even recklessly when [she] considered the consequences of

[her] handling of [plaintiff's] case." *See Miranda*, 900 F.3d at 353.  It is not enough to show a defendant was negligent or even grossly negligent. *Id.*  The second step asks whether the challenged conduct was objectively reasonable based on the totality of the circumstance faced by the defendant. *Id*. at 354.

        C.      <u>Nurse Keen's Motion for Summary Judgment (Doc. 210)</u>

McIntosh seeks to hold Nurse Keen liable because she gave him unauthorized prescription medication and failed to monitor the effects he suffered as a consequence of the medication.  In her motion for summary judgment, Nurse Keen challenges whether McIntosh suffered from an objectively serious medical need, whether the evidence shows her conduct was objectively unreasonable, and whether her alleged conduct was the cause of McIntosh's alleged injuries.  She also challenges whether McIntosh can show she participated in the decision on August 4, 2013, to send him to segregation without screening him for suicidal ideation such that she could have been objectively unreasonable in this regard.

McIntosh had a serious medical need not to be given medication that was not prescribed for him by an authorized medical professional.  The evidence, viewed in the light most favorable to McIntosh, shows that Nurse Keen's giving McIntosh unprescribed medication without appropriate instruction or monitoring for complications was purposeful and that she knew her conduct posed a risk to McIntosh's health.  It would be easy for a jury to find that Nurse Keen was not objectively reasonable in the circumstances when she dispensed unauthorized medication to McIntosh.  A reasonable jury could also find that Nurse Keen's supplying McIntosh with such medication caused him to suffer adverse reactions to the medication, whether simply because of the medications' side effects, because of an addiction, or because of addiction withdrawal.  In this way, the evidence supports that the medications caused damage to

8

McIntosh's mental, emotional, and physical health and also potentially played a causal role in his suicide attempt. Therefore, Nurse Keen is not entitled to summary judgment on McIntosh's medication-based claim in Count 1.

To the extent McIntosh faults Nurse Keen with failing to conduct a suicide risk assessment before McIntosh was sent to segregation in August 2013, the evidence is not sufficient to show she was personally involved in that decision. It is true that "[g]enuine suicidal ideation is an objectively serious medical condition," *Williams v. Van Buren*, No. 22-2918, 2023 WL 3451407, at *2 (7th Cir. May 15, 2023) (citing *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019)), but the evidence does not show that Nurse Keen was involved with McIntosh that day and behaved in an objectively unreasonable manner. The Court will grant summary judgment for Nurse Keen on McIntosh's suicide risk assessment-based claim in Count 1.

D.    Nurse Rodriquez's Motion for Summary Judgment (Doc. 213)

McIntosh seeks to hold Nurse Rodriguez liable because she failed to ensure he was evaluated for suicide risk before he was put in segregation on August 4, 2013. He does not, however, connect her in any way to Nurse Keen's unauthorized dispensation of prescription medication. In her motion for summary judgment, Nurse Rodriguez does not really contest that a detainee's suicidal ideation is an objectively serious medical condition requiring a response. *See Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019). She contends, however, that her response was objectively reasonable in light of the totality of the circumstances.

The evidence, viewed in the light most favorable to McIntosh, shows that Nurse Rodriguez is right. Jail officers had just shaken down McIntosh's possessions and found unauthorized prescription drugs in his possession, along with other contraband. No evidence suggests Nurse Rodriguez would have had reason to think the Jail officers had missed a

9

substantial stash of drugs hidden in his mattress that McIntosh could have taken in segregation to harm himself.

Furthermore, while Nurse Rodriguez knew McIntosh had been placed in the quite room for a suicide note in February 2013, he denied he had been suicidal when the note was found, and a mental health counselor had cleared him for release from the quiet room the day after he was moved there. And nothing about McIntosh's behavior on August 4, 2013, would have made Nurse Rodriguez suspect a suicide risk assessment was called for. He did not talk about suicide or the effects of the unprescribed prescription medications he had been taking, and he did not otherwise do anything a reasonable Jail officer would recognize as a portend of self-harm. Indeed, McIntosh testified that when he was first sent to segregation, he was *not* contemplating suicide and only began thinking about it hours later after he had taken a couple of pills to help him sleep. In these circumstances, it was objectively reasonable for Nurse Rodriguez to forego screening McIntosh for suicide risk when the decision was made to place him in segregation. And if there was something Nurse Rodriguez should have discovered to show a suicide screening was necessary, her failure to recognize that would amount to nothing more than negligence, which does not support a Fourteenth Amendment violation.

To the extent McIntosh claims Nurse Rodriguez failed to identify him as a suicide risk before the August 4, 2013, shakedown, there is no evidence from which a reasonable jury could find she behaved in an objectively unreasonable manner in the circumstances. To the extent McIntosh faults her for failing to find him at risk of suicide on his entry into prison when he was depressed and under stress, he admits he was not suicidal then. In any case, he was evaluated by mental health staff at that time, which is what Nurse Rodriguez would have recommended had she thought he was at risk of suicide. He was found to be depressed but not suicidal and was

referred to a psychiatrist. In addition, any such failure on Nurse Rodriguez's part at that time was superseded by his February 2013 stay in the quiet room and subsequent mental health evaluation finding him able to be released back to the infirmary.

For these reasons, the Court will grant summary judgment for Nurse Rodriguez on Count 1.

**III.    Wexford**

In Count 2, McIntosh claims Wexford is liable for its policies of (1) providing inadequate suicide prevention and prescription handling training to employees, (2) failing to supervise employees and fully vet candidates during the hiring process, and (3) failing to maintain procedural safeguards to monitor prescription pills at the Jail.

A.    Facts

The following supplemental facts pertain to Wexford's potential liability. Viewing the evidence and the reasonable inferences that can be drawn from it in McIntosh's favor, the evidence establishes the following relevant facts for the purposes of this motion.

Wexford contracted with the Jail to provide medical services to detainees and to coordinate outside care when it was needed. Nurse Keen and Nurse Rodriguez were two Wexford employees hired to provide medical services to the Jail.

Wexford maintains jail policies applicable to all the jails in which it provides medical services. Wexford's policies relating to hiring employees include conducting multiple interviews of applicants to work as a nurse in a jail and a background check before the applicant is hired. It also has supervisory personnel to review what other employees on the same health care team are doing. With respect to Nurse Keen particularly, Wexford conducted a background check on her before it assigned her to work in the Jail. Presumably she passed the background check because

11

Wexford assigned her to work there.

When a detainee arrived at the Jail with medication prescribed by an outside doctor, Wexford's policy was to confiscate those medications and keep them in a separate locked cabinet in the nurses' station in the infirmary. It was not unusual for the confiscated medication to have abuse potential like narcotics, which Jail doctors generally would replace with Tylenol or other appropriate non-narcotic medication.

As for distribution of medication in the infirmary, a nurse distributed to individual detainees the medication ordered or prescribed to the detainee by a Jail doctor as reflected in paper lists compiled by the doctor. Nurses were not allowed to dispense medication that was not approved by a doctor as reflected on the lists. To dispense the medication, the nurse would call individual detainees up to the bars at the front of the infirmary where the nurse would dispense the detainee's prescribed medication. When Keen was dispensing medication, she would call McIntosh up even though he had been prescribed no medication, and she would give him unprescribed medications.

To keep track of the medication in its custody, Wexford had detailed policies and procedures regarding counting and dispensing controlled substances in compliance with federal, state and local rules. These policies required oncoming and outgoing nurses to count controlled medications at every shift change. Only the nurse assigned to dispense medications on a particular shift had the key to where the medications were kept, and that nurse would give the key to the nurse assigned to dispense medications the following shift, who would then count the controlled substance medications. Wexford's policies called for non-controlled "stock" prescription medications to be tracked by a "perpetual" legend/inventory where nurses were to record medication doses received from the pharmacy and dispensed to detainees. A regional

pharmacist was to perform an inventory every month.  No counts were short during the time period Keen gave unprescribed medication to McIntosh.

Wexford trains its employees who work in correctional facilities about suicide risks for incarcerated individuals both at their initial employment orientation and annually thereafter.  It also provides additional training "as needed."  The training teaches staff to notify the mental health counselor to perform a suicide risk assessment if there was reason to believe a detainee was suicidal.  The policy also involved taking detainees to the "quiet room" where they could not hurt themselves, monitoring them, and not releasing them until a mental health counselor approved it.

B.     Legal Standard

A private corporation like Wexford is liable under § 1983 to at least the same extent as municipalities.  *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (*en banc*).  A municipality may not be held vicariously liable for actions of its employees under § 1983 on a *respondeat superior* theory.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  It may be liable, however, for its own actions as a municipality.  *Id.* at 690-92.  A municipal action occurs where (1) the municipality had an express policy calling for a constitutional violation, (2) the municipality had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) if a person with final policymaking authority for the municipality caused the constitutional violation.  *Id.* at 694.  And the policy, custom, or decision must be the moving force behind the constitutional violation.  *Id.*  McIntosh asserts that Wexford had widespread practices that violated McIntosh's constitutional rights and that Wexford knew about and failed to address them.  *See Hildreth*, 960 F.3d at 426.

13

Where a plaintiff relies on a widespread practice to establish municipal policy, one or two instances of a violation are usually not enough to show a widespread practice; there must be "systemic or gross deficiencies." *Id.* Indeed, proving a custom requires "evidence of a *prior pattern* of similar constitutional violations." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) (emphasis added); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) (plaintiff claiming widespread practice "must point to other inmates injured by that practice").

And to hold a defendant liable for a widespread practice under *Monell*, the plaintiff must show that the defendant knew about it and deliberately failed to address it. Such deliberate indifference is the lynchpin necessary to attribute liability under *Monell*. After all, if Wexford had no reason to know of a practice, it cannot be said to have a corporate policy of tolerating it. Only where the defendant knew of and was deliberately indifferent to the practice can it be said that the municipality *caused*—that is, was the moving force behind—the violation. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."); *Hildreth*, 960 F.3d at 426; *Glisson*, 849 F.3d at 379.

C.   Analysis

In his Complaint, McIntosh suggests a variety of "widespread practices" for which Wexford could be liable. The Court notes that Wexford cannot be vicariously liable under § 1983 for Nurse Keen's or Nurse Rodriguez's constitutional violations.

The first challenged practice is Wexford's alleged policy of providing inadequate suicide prevention. The evidence does not support such a policy. Wexford had a written policy and

trained its employees in orientation, annually, and as needed. That policy involved placing the detainee in the quiet room and notifying the Jail doctor and counselor. The detainee is then regularly observed. McIntosh points to his own attempted suicide in August 2013 as evidence that the policy was inadequate. However, there is no evidence that Wexford's suicide prevention efforts have "systemic or gross deficiencies" such that the failure to change them amounted to a deliberate corporate policy of inadequacy. Indeed, as demonstrated in February 2013 when McIntosh's suicide note was found, the existing policy was implemented and was sufficient to avert a suicide attempt. In August 2013, Nurse Rodriguez and other Jail personnel simply failed to predict that McIntosh was going to attempt suicide when he did, but those judgments cannot be attributed to Wexford.

McIntosh also asserts Wexford had an inadequate policy of training its employees to handle prescriptions that allowed Nurse Keen to give him unprescribed medications to which he became addicted. Again, he only points to his own experience, not a widespread practice. Wexford had written policies instructing its employees how to comply with federal, state, and local rules regarding handling controlled substances and dispensing them to detainees authorized to take them. It also trained its employees to inventory the controlled substances at every shift change—that is, multiple times a day—and there is no evidence of any discrepancies in the inventory count. Other medications are inventoried less strictly, but are inventoried, and all medications are secured and tracked through written records of what substances nurses dispensed to which detainees. Nurses are instructed only to dispense medication properly prescribed as set forth on doctor's lists. That Nurse Keen decided to give unauthorized prescription drugs to McIntosh is not sufficient to show a widespread practice of improper handling of prescriptions.

Furthermore, even if Nurse Keen's conduct in giving McIntosh unauthorized prescription

15

drugs could be considered "widespread" because of the frequency with which it occurred with him, no evidence suggests that Wexford knew about it. Without this knowledge, no reasonable jury could conclude that Wexford deliberately chose to continue with inadequate training. McIntosh never complained about Nurse Keen until this litigation, none of those working around Nurse Keen noticed anything amiss, and the drug inventories were normal. There is simply no evidence that Wexford deliberately chose a training program that allowed nurses to mishandle prescription drugs.

Similarly, there is no evidence other than Nurse Keen's undetected malfeasance that Wexford had a systemic and grossly inadequate system of supervising employees. Its system provided channels for supervisors or employees who had concerns about their coworkers to report their concerns. That Nurse Keen went undetected, even on numerous occasions, could not have alerted Wexford that its supervision and reporting practices were inadequate.

There is no evidence of a widespread Wexford practice of inadequately vetting candidates for employment. The hiring practice included a background check and multiple interviews to ensure only law-abiding individuals were hired. No evidence suggests that even Nurse Keen—or Nurse Rodriguez or any other Wexford employee—was not properly vetted before hiring as opposed to just choosing afterward to misbehave.

Finally, there is no indication of a widespread practice of improper monitoring of prescription pills in the Jail. As noted above, Wexford had written policies that to ensure compliance with federal, state, and local rules, and inventories of medication during the relevant times showed no discrepancies. Although Nurse Keen was able to circumvent detection to provide unauthorized prescription medication to McIntosh, no evidence suggests Wexford knew

its policies allowed for such circumvention and deliberately chose not to change those policies.[2]

In his response to Wexford's summary judgment motion, McIntosh also suggests Wexford had a policy of providing inadequate medical personnel to work in the Jail. Rather than complaining of the number of medical staff in the Jail, this claim seems to echo McIntosh's complaints that staff were inadequately trained and performed inadequately, claims the Court has already addressed.

Because no reasonable jury could find Wexford had accepted a widespread practice of constitutional violations, it is entitled to summary judgment on Count 2.

### IV. Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** Nurse Keen's motion for summary judgment on Count 1 (Doc. 210). The motion is **GRANTED** as to McIntosh's suicide risk assessment-based claim in Count 1. The motion is **DENIED** as to McIntosh's medication-based claim in Count 1;

- **GRANTS** Nurse Rodriguez's and Wexford's motion for summary judgment on Counts 1 and 2, respectively (Doc. 213); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

Defendants Nurse Rodriguez and Wexford are terminated from this case. By separate order, the Court will set a telephone status conference to select dates for the Final Pretrial Conference and Trial.

**IT IS SO ORDERED.**
**DATED: June 21, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

---

[2] The Court notes that Nurse Keen maintains that she did not provide any prescription medication to McIntosh, but for the purposes of this summary judgment motion, the Court must assume she did.